UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

FILED

99 FEB -9 AM 10: 33

N.D. OF ALABAMA

| | |
|---|---|
| MARY ANNE SIMS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 97-S-2238-NE |
| | ) |
| MORGAN COUNTY COMMISSION, | ) **ENTERED** |
| | ) |
| Defendant. | ) |

FEB 0 9 1999

## MEMORANDUM OPINION

Mary Anne Sims is Deputy Director of the Morgan County
Emergency Management Agency. Her complaint contains two claims:
(1) defendant failed to promote plaintiff because of her gender in
violation of Title VII of the Civil Rights Act of 1964, as amended,
42 U.S.C. § 2000e *et seq.*;[1] and (2) retaliation in violation of
Title VII. The action now is before the court on defendant's
motion for summary judgment.[2]

### I. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides
that summary judgment "shall be rendered forthwith if the
pleadings, depositions, answers to interrogatories, and admissions
on file, together with the affidavits, if any, show that there is
no genuine issue as to any material fact and that the moving party

---

[1] Complaint at 2 ¶¶ 4-5.

[2] Plaintiff originally named as individual defendants Larry Bennich, E.V.
White, Charles Sparkman, Joseph Summerford, and Howard Jinkins. See Complaint,
Document No. 1. Each was dismissed by order entered September 22, 1997.
(Document No. 8.)

39

is entitled to judgment as a matter of law." "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). "It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.*

The moving party has the initial burden of showing the absence of a genuine issue as to any material fact. *Id.* In determining whether this burden is met, the court must view the evidence "and all factual inferences arising from it in the light most favorable to the nonmoving party." *Id.* (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970)).

Once the movant's initial burden is met, "the burden shifts to the nonmovant to 'come forward with specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)). In meeting its burden, "the nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992) (citing

2

*United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)).

"'The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Tipton*, 965 F.2d at 999 (quoting *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513). Even so, a "mere 'scintilla' of evidence supporting the [nonmoving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 242, 106 S.Ct. 2505). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356 (citation omitted).

With those standards in mind, the court now proceeds to summarize the undisputed facts or, if disputed, to frame them in a light most favorable to plaintiff.

## II. STATEMENT OF FACTS

Mary Anne Sims was first employed by the "Morgan County Civil Defense Department" in 1974, as part of the Comprehensive Employment Training Act ("CETA") program.[3] At some point that is not established in the record, the civil defense department was

---

[3] Plaintiff's Deposition I at 25.

3

renamed the Morgan County Emergency Management Agency ("MCEMA").[4]
She worked as a clerk/typist under the supervision of the
departmental director, Howard Proctor.[5]

Following two years of employment under the auspices of CETA,
Sims decided to apply for a permanent position with the
department.[6] As a condition for doing so, she sat for the state
merit system exam for a clerk/typist position in 1976. Later that
same year, Sims was offered employment by Morgan County in the
full-time position of Clerk/Typist II.[7] She accepted the offer and
worked in that position until late 1979, when she sat for the state
merit system exam as a prerequisite for applying for the position
of departmental deputy director. Sims was appointed deputy
director in January of 1980.[6] She continues to hold this position.

Sims first filed a lawsuit against the Morgan County
Commission in the Circuit Court of Morgan County, Alabama, on April
27, 1992, alleging that the commission had failed to enroll her in
the Employees Retirement System of Alabama.[9] The case was tried
during January of 1996. A directed verdict was entered in favor of

---

[4] *Id.* at 43.

[5] *Id.* at 26. Sims' duties included answering the telephone, typing
letters, and running the copy machine.

[6] *Id.* at 27-28.

[7] *Id.* at 30.

[8] *Id.* at 33.

[9] Shinn's Affidavit at ¶ 2.

4

the commission.[10]

Howard Proctor, Director of MCEMA, died in September of 1995.[11] According to Sims, Proctor was an alcoholic and had not fully performed his duties for ten years.    Sims contends that, in Proctor's absence, she coordinated fire and police departments and usually was the only person who responded on behalf of MCEMA in emergency situations.[12]

At the time of Howard Proctor's death, Larry Bennich, Chairman of the Morgan County Commission, and Julian Price, Mayor of the City of Decatur, were leaving for a trip to Japan and Korea.  Mayor Price returned a week before Chairman Bennich, however.  Sims met with Mayor Price during that interval.  She reported that the MCEMA office was in disarray and bad weather was approaching.    In response to the concerns raised by Sims, Mayor Price issued a memo to all MCEMA employees stating:

> Due to Chairman Larry Bennich being out of town and because of this emergency weather situation, I feel it incumbent upon myself to establish temporary leadership in the agency.  I, therefore, appoint Ms. Mary Ann Sims as Temporary Supervisor.
>
> This is not a permanent situation, but to establish a chain of command until such time as a permanent Director is named.

(Plaintiff's Exhibit 7.)

---

[10] *Id.*

[11] Plaintiff's Deposition II at 8; Price Affidavit at ¶ 3.

[12] Plaintiff's Deposition II at 10-11.

5

Upon his return from Japan, Morgan County Commission Chairman

Bennich revoked Mayor Price's directive.    According to Chairman

Bennich, the Mayor did not possess the authority to appoint or

designate an acting director of MCEMA, even on a temporary basis.[13]

Sims thereafter applied for the position of MCEMA Director.[14]

She submitted her resume to Chairman Bennich in October of 1995,

before the position vacancy was publically announced.[15]   She also

reported to Chairman Bennich that Fred Keeney, the "Local Emergency

Planner" for MCEMA, removed the telephone from Howard Proctor's

office and placed it in another office, canceled Proctor's private

telephone line, destroyed documents that were in Proctor's office,

and cursed Sims on several occasions.[16]  According to Sims, Chairman

Bennich responded that she and Keeney were professionals, they did

not need a supervisor, and should work together.

The Director of MCEMA is an appointed official.  The selection

of a person to fill the position is the sole responsibility of the

Morgan County Commission.[17]    The County Commission created the

position by resolution adopted in 1963:

---

[13] Bennich Deposition at 30; Price Deposition at 34.

[14] Plaintiff's Deposition at 34.

[15] Id. at 44-45.

[16] Id. at 37-38.

[17] Bennich Affidavit at ¶ 4.

6

Section III. - Civil Defense Coordinator[18]

    There is hereby created the office of the Morgan
County Civil Defense Coordinator. Such Officer shall be
nominated by the Chairman of the Board of Revenue and
Control[19] and approved by the Board of Revenue and
Control in, and for, Morgan County. ...

(Bennich Affidavit ¶ 5, Exhibit 1.) The position is unclassified

and, therefore, the occupant is not subject to civil service merit

system protections or procedures, as are other Morgan County

employees.[20] The chairman of the county commission nominates a

person to fill the position, subject to approval of the other

commission members.[21]

    In this instance, however, the commission elected to follow

procedures similar to those employed when filling other Morgan

---

[18] As noted on page 3 supra, MCEMA originally was called the "Morgan County
Civil Defense Department." The director of that department originally was
designated "coordinator."

[19] The original name of the entity known as the Morgan County Commission.

[20] *Id.* at ¶4. According to the Morgan County personnel policies and
procedure manual, which plaintiff's counsel read into the record at  Mr.
Bennich's deposition, the definitions of "unclassified" and "classified"
employees are as follows:

> An unclassified employee is defined as salaried employees who serve
> at the pleasure of elected officials either as department heads or
> as members of the personal staff of elected officials except in
> their actions toward classified employees shall be governed by these
> policies. Only matters of leaves of absence, employee development,
> conduct, retirement records and reports.

> Classified is all other salaried or hourly wage employees paid from
> Morgan County funds or from state or federal funds administered by
> Morgan County.

Bennich Deposition at 8-9.

[21] Bennich Affidavit at ¶ 5.

7

County employment positions: *i.e.*, the position vacancy initially would be advertised internally throughout the Morgan County Courthouse and Decatur City Hall; first consideration would be given to present county and city employees; and the position would be opened to outside applicants only if the commission chairman decided that outside applicants might possess higher qualifications, experience, or skill levels than "in-house" applicants.[22]   Chairman Bennich was solely responsible for interviewing applicants. Even so, the county commission elected to include Mayor Price in the interview process as a courtesy, because the City of Decatur annually contributed to the funding of MCEMA. The mayor's role was intended to be advisory only. He had no selection authority.[23]     Rather, Mayor Price offered recommendations, but Commission Chairman Bennich retained ultimate authority to nominate persons for approval by the county commission.[24]

Pursuant to the procedure set forth above, the position vacancy announcement was posted in the Morgan County Courthouse, and copies were mailed to each department of county government and to the Decatur City Hall, on March 20, 1996.[25]

---

[22] *Id.* at ¶ 6.

[23] *Id.* at ¶ 10.

[24] Price Deposition at 7-8.

[25] Bennich Affidavit at ¶ 7.

8

Following the posting, the commission received 21 applications, consisting of four "in-house" applicants and seventeen "outside" applicants, who were not considered prior to the evaluation and interview of the "in-house" applicants.[26] Fred Keeney subsequently withdrew his name from the "in-house" list. Therefore, Commission Chairman Bennich and Mayor Price, interviewed one male and two female "in-house" applicants on March 26, 1996.[27] Sims was one of the female "in-house" applicants interviewed.[28] Chairman Bennich directed a letter to the three persons interviewed the following day.

> On behalf of Mayor Price and myself I want to thank you for your interest in the Emergency Management Director's position.

> We want you to know that you are still in contention; however, we will be interviewing several more applicants.

(Defendant's Exhibit K4.)

Chairman Bennich advertised the position vacancy in the local newspaper on March 31, 1996,[29] to see whether persons with greater experience and background in emergency management would apply.[30]

---

[26] *Id.* at ¶ 8.

[27] *Id.* at ¶ 9. The three "in-house" applicants interviewed were: Mary Anne Sims, Michael L. Harvey, and Robbie S. Wiggington. Bennich Deposition at 9.

[28] Bennich Affidavit at ¶ 9.

[29] *Id.* at ¶ 11.

[30] *Id.*

9

The decision to seek outside applicants allegedly was not unusual.[31]

From the "outside" applicants, Chairman Bennich selected seven persons (five men and two women) to be interviewed. Six of the seven were interviewed by Chairman Bennich and Mayor Price on May 10, 1996;[32] J. Allen Orman was interviewed on a later date.[33] Following all interviews, Chairman Bennich decided that the "outside" applicants possessed significantly higher qualifications and more experience than any of the "in-house" applicants.[34]

Chairman Bennich later said that his primary selection criterion for the position was whether the applicant had actually managed an emergency management agency.[35] No written list of selection criterion existed, however. According to Mayor Price, he and Chairman Bennich wanted to find the best qualified person

---

[31] Dockery Affidavit at ¶ 8. According to Willa Dockery, Administrator for Morgan County, outside applicants were sought for the following positions:

Recycling Coordinator, 1993; Chief Appraiser-Revenue Commissioner, 1994; Director of Commission on Aging, 1995; Local Emergency Planner, 1996; Athletic Director-Parks & Recreation Department, 1996; and Chief Probation Officer, 1997 ... Clerk/Typist District No. 1, 1996; Environment Service Mechanic, 1996; Environment Service Driver, 1996; Environment Service Collector, 1996; Night Custodial Worker, 1996; Registered Nurse, Jail, 1996; Clerk/Typist-Probate Office, 1996; Property Appraiser, 1996; and Computer Programmer/Operator, 1996.

[32] Bennich Affidavit at ¶ 15, exhibit 6. The following "outside" applicants were interviewed: Rita Taylor Yelverton, Herschel E. "Eddie" Hicks Jr., Bobby E. Clemmons, Mitchell Dale Hopkins, Paulette W. Williams, and Thomas Johnson.

[33] *Id.*

[34] *Id.* at ¶ 16.

[35] *Id.*

10

available.  Mayor Price defined what he meant by "well qualified"

as:

> [e]xperience, exhibited management skills, ability
> to interrelate with peoples at all level in the hierarchy
> of both political side of the situation and the emergency
> management side of the situation, to know where to go for
> answers in any sort of situation.

> But I think that the most important thing to me was
> a demonstrated ability to operate an agency based on --
> because people were available with these skills.  I felt
> that it was very important for us to perhaps find someone
> who managed a smaller agency or a similar agency or
> someone who had experience in managing an operation of
> the type that is operated here.

(Price Deposition at 24.)  Based on such considerations, Chairman

Bennich and Mayor Price focused on three "outside" applicants:

Paulette Williams; Bobby E. Clemmons; and Herschel E.  "Eddie"

Hicks, Jr.[36]

Paulette Williams then was an Area Coordinator for the Alabama

Emergency Management Agency.[37]  The commission ultimately was unable

to offer her the director's position, however, because her salary

requirements grossly exceeded the amount budgeted by the county.[38]

Bobby E. Clemmons was Director of the Houston County Emergency

---

[36] *Id.* at ¶¶ 17-19.  Sims was among the top six candidates given serious consideration.  Price Deposition at 24-25.

[37] Williams Deposition at 6.  Mrs. Williams had also served as the State Director of the Alabama Emergency Management Agency between 1994 and 1995.  She was appointed to this position by Governor Jim Folsom.  Prior to her appointment in 1994, Mrs. Williams was Area Coordinator I for the state agency.  *Id.* at 6-7.

[38] Bennich Affidavit at ¶ 17; Price Deposition at 11.  The budgeted salary for the director's position was $37,500, and Ms. Williams minimum starting salary requirement was $50,000.

11

Management Agency. He ultimately withdrew his name from consideration, because a complaint was filed against him with the Alabama Ethics Commission.[39] An article regarding the ethics complaint ran in the Decatur *Daily* newspaper on Thursday, May 30, 1996.[40] After reading the article, Mary Anne Sims' husband, Eldred Sims, telephoned Mayor Price on either Friday, May 31, or Monday, June 3, 1996. Mr. Sims voiced his concern over the possibility that Clemmons might be hired as Director of MCEMA.[41] He also asked why his wife was being "passed over" for the director's position. According to Mr. Sims, Mayor Price responded in substance that Mrs. Sims had filed an EEOC suit, and the suit was the reason she was being passed over.[42] In fact, however, Mary Anne Sims had filed a charge of discrimination with the EEOC on April 16, 1996, alleging gender-based wage discrimination. Sims alleged she was paid less than Fred Keeney.[43] Mayor Price denies telling Eldred Sims the EEOC charge was the reason Mary Anne Sims was not being considered for the position. According to Price, he was not even aware she had filed an EEOC charge on the date he spoke to Eldred Sims. Price contends the Retirement Systems suit was the only suit of which he

---

[39] Bennich Affidavit at ¶ 18.

[40] Eldred Sims Deposition at 19.

[41] *Id.* at 20.

[42] *Id.* at 25.

[43] Shinn Affidavit at ¶ 3.

12

was aware until April of 1998.

The third person interviewed, Eddie Hicks, then was (and for 17 years had been) Director of the Colbert County Emergency Operation Center.[44] Based on his qualifications, interview, and recommendations, Chairman Bennich decided to nominate Hicks for the director's position.[45] Bennich concluded that Hicks was more qualified and superior to all candidates interviewed.[46] According to Bennich, Hicks' seventeen years as Director of the Colbert County agency was one of the most important considerations.[47]

Sims filed a second charge of discrimination with the EEOC in June of 1996, alleging she was not offered the director's position because of gender, age, and in retaliation for her wage discrimination complaint.[48]

Sims filed a suit based on her wage discrimination charge in the United States District Court for the Northern District of Alabama on August 27, 1996.[49] That case was dismissed pursuant to defendant's motion for summary judgment on December 15, 1997. Sims

---

[44] Bennich Affidavit at ¶ 19; Bennich Deposition at 49. The court notes that the Colbert County Emergency Operation Center is the equivalent to the Morgan County Emergency Management Agency.

[45] Bennich Affidavit at ¶ 20.

[46] *Id.*

[47] Bennich Deposition at 49.

[48] Shinn Affidavit at ¶ 4. Note that Sims alleged age discrimination in her EEOC charge, but did not assert such a claim in the complaint filed here.

[49] *Mary Anne Sims v. Morgan County Commission*, Civil Action No: CV96-S-2251-NE.

13

filed the present suit on August 29, 1997.[50]

### III. DISCUSSION

**A.    Proof of Defendant's Intention to Discriminate**

To prevail on a Title VII disparate treatment claim, plaintiff must prove her employer intended to discriminate on the basis of one of the impermissible factors identified by Congress: *i.e.*, "because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Three forms of proof may be used: (1) statistical proof of a pattern of discrimination[51]; (2) direct evidence of a discriminatory animus[52]; or (3) circumstantial evidence. The evaluation of a plaintiff's evidence of the employer's intent differs, depending upon which form of proof is used.

####  1.    Direct evidence

Direct evidence has the greatest probative value. When a plaintiff establishes by direct evidence that a contested employment decision was motivated by a discriminatory animus, the employer "may avoid a finding of liability only by <u>proving</u> by a preponderance of the evidence that it would have made the same decision even if it had not taken the plaintiff's gender into

---

[50] Shinn Affidavit at ¶ 6.

[51] *See, e.g.*, Wilson v. AAA Plumbing Pottery Corp., 34 F.3d 1024, 1027 (11th Cir. 1994).

[52] *See, e.g.*, Carter v. City of Miami, 870 F.2d 578, 581-82 (11th Cir. 1989).

14

account." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258, 109 S.Ct. 1775, 1795, 104 L.Ed.2d 268 (1989) (emphasis supplied); *see also, e.g., Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641 (11th Cir. 1998); *Haynes v. W.C. Caye and Co., Inc.*, 52 F.3d 928, 931 n.8 (11th Cir. 1995). In other words, "defendant must prove that there was a separate, [non-discriminatory] reason for its" contested employment decision. *E.E.O.C. v. Alton Packaging Corp.*, 901 F.2d 920, 925 (11th Cir. 1990) (race discrimination claim) (emphasis supplied).

> In a direct evidence case, the plaintiff must produce direct testimony that the employer acted with discriminatory motive, and must convince the trier of fact to accept the testimony. If the plaintiff produces such evidence and the trier of fact believes it, the defendant must prove by a preponderance of the evidence that the defendant would have reached the same decision without the factor proved. In other words, the employer must prove that even if it had not taken race into account, it would have come to the same decision.

*Id.* at 923 (emphasis supplied) (citations omitted).

Thus, the characterization of evidence as direct or circumstantial "dramatically affects the allocation of the evidentiary burdens." *Carter*, 132 F.3d at 641. "When there is direct evidence that discrimination was a motivating factor in the challenged employment decision, the appropriate analysis is different from that employed in a case where only circumstantial evidence is available." *Trotter v. Board of Trustees of the*

15

*University of Alabama*, 91 F.3d 1449, 1453 (11th Cir. 1996) (citing *Bell v. Birmingham Linen Service*, 715 F.2d 1552, 1556 (11th Cir. 1983), *cert. denied*, 467 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984); *Haynes*, 52 F.3d at 931).

The Eleventh Circuit defines direct evidence as evidence which, if believed, proves the existence of a fact in issue without the need to engage in the processes of inference or presumption. *See, e..g., Carter*, 132 F.3d at 642 ("Direct evidence, by definition, is evidence that does not require ... an inferential leap between fact and conclusion."); *Merritt v. Dillard Paper Co.*, 120 F.2d 1181, 1189 (11th Cir. 1997) (defining direct evidence as "evidence, which if believed, proves existence of fact in issue without inference or presumption."); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n.6 (11th Cir. 1987).

Statements of decisionmakers directly related to the contested employment action are direct evidence of discrimination. *See, e.g., Carter*, 132 F.3d at 641 ("direct evidence relates to actions or statements of an employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee") (quoting *Caban-Wheeler v. Elsea*, 904 F.2d 1549, 1555 (11th Cir. 1990) (internal quotation marks omitted)); *Trotter*, 91 F.3d at 1453 ("Statements indicating

16

... bias on the part of a decisionmaker in an employment setting can constitute direct evidence of ... discrimination in Title VII cases") (citations omitted); *Bell v. Birmingham Linen Service*, 715 F.2d 1552 (11th Cir. 1983) (plaintiff's supervisor voiced bias to plaintiff at the very moment he rejected plaintiff for promotion), *cert. denied*, 467 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984); *Thompkins v. Morris Brown College*, 752 F.2d 558, 561, 563-64 (11th Cir. 1985) (statement by decisionmaker that he saw no need for a woman to have a second job constituted direct evidence of discriminatory intent).

On the other hand, statements that do "not relate directly to the decision" in dispute, or "statements that are open to more than one interpretation do not constitute direct evidence of ... discrimination." *Carter*, 132 F.3d at 642. "Only the most blatant remarks, whose intent could only be to discriminate on the basis of [an impermissible factor] constitute direct evidence." *Coats v. Coats & Clark, Inc.*, 990 F.2d 1217, 1226 (11th Cir. 1992). Evidence merely suggesting discrimination is not sufficient. *See Earley v. Champion International Corp.*, 907 F.2d 1077, 1081-82 (11th Cir. 1990).

Moreover, "stray remarks in the workplace," "statements by nondecisionmakers," and "statements by decisionmakers unrelated to

17

the decisional process itself" do not "justify requiring the employer to prove that its hiring or promotion decisions were based on legitimate criteria." *Price Waterhouse*, 490 U.S. at 277, 109 S.Ct. at 1804-05 (O'Connor, J., concurring).

For example, in *E.E.O.C. v. Alton Packaging Corp.*, 901 F.2d 920 (11th Cir. 1990), the employer's general manager (Robert Raymond) allegedly said "if [Alton Packaging] was his company, he wouldn't hire any black people." *Id.* at 922. In addition, the production manager (Robert Diesen) allegedly yelled at one black employee "--- ---- it, you people can't do a ------- thing right." *Id.* The Eleventh Circuit held the former statement to be direct evidence of discriminatory intent by a decisionmaker, but the latter nothing more than a "stray remark," "unrelated to the decisional process itself."

> *Price Waterhouse* does not define direct evidence. In her concurrence, however, Justice O'Connor stated that "stray remarks in the workplace," "statements by nondecisionmakers," and "statements by decisionmakers unrelated to the decisional process itself" do not "justify requiring the employer to prove that its hiring or promotion decisions were based on legitimate criteria." *Price Waterhouse*, 109 S.Ct. at 1804. Raymond's statement that if it were his company he would not hire blacks does not fall into any of these categories. Raymond was a decisionmaker, and he made the remark in reference to hiring. [On the other hand,] Diesen's statement is the kind of stray remark contemplated by Justice O'Connor, but does not affect the outcome. Raymond's statement constituted direct evidence of discrimination which Alton was required to rebut by a preponderance of the evidence. The district court erred

18

when it failed to place this burden on Alton.

*Id.* at 924 (emphasis supplied).

Another instructive case is *Hunter v. Allis-Chalmers Corporation*, 797 F.2d 1417 (7th Cir. 1986), where Judge Posner commented upon the relevance and probative value of stray remarks by nonsupervisory employees.

> [A] company certainly is not liable for every racial slur by a nonsupervisory member of its work force. ... Not only is it hard to see how an isolated racial slur could be thought a significant enough event to count as employment discrimination; it is unclear what practical steps an employer could take to purge all racially offensive speech from the workplace.

*Id.* at 1421 (Posner, J.)(citations omitted).

### 2.  Circumstantial evidence

Normally, however, a plaintiff does not possess direct evidence of the employer's motive. "There will seldom be 'eyewitness' testimony as to the employer's mental processes." *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 716 103 S.Ct. 1478, 1482 (1983). Even so, discriminatory intent sometimes can be presumed from circumstantial evidence. In such cases, a shifting burden framework of analysis is applied to evaluate the strength of the plaintiff's proof and its ability to withstand a defendant's motion for summary judgment.

When evaluating the evidence in the record, courts are guided by the evidentiary framework announced in *McDonnell Douglas Corp.*

19

*v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and

elaborated in its progeny.  *St. Mary's Honor Center v. Hicks*, 509

U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Texas Department*

*of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67

L.Ed.2d 207 (1981).  The plaintiff bears the initial burden of

producing circumstantial evidence of the employer's intent to

discriminate on the basis of sex, or to retaliate against an

employee who engaged in statutorily protected expression or

activity, and thereby establishing a prima facie case.

> The establishment of the *McDonnell Douglas* elements is
> significant for two reasons: first, it creates a
> presumption of unlawful discrimination that the employer
> must rebut or lose as a matter of law; and, second, it
> means that the plaintiff has presented evidence allowing
> a  reasonable  trier  of  fact  to  infer  unlawful
> discrimination.  The burden then shifts to the employer
> to articulate legitimate nondiscriminatory reasons for
> the failure to promote [or other contested employment
> action].  Successfully carrying this burden bursts the
> presumption of discrimination and leaves only the
> ultimate question — whether the employer's offered
> explanations are pretextual. ...

*Carter*, 132 F.3d at 642-43 (citing, *e.g., Combs v. Plantation*

*Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997)).

## B.  Failure To Promote Based On Gender

Mary Anne Sims does not present statistical evidence, nor does

she present any direct evidence of discriminatory intent in support

of her claim that the defendant failed to promote her because of

her gender.  Therefore, that claim will be analyzed under the

20

*McDonnell Douglas* framework.

### 1.   Plaintiff's prima facie case

For many years, the Eleventh Circuit entertained two, conflicting lines of precedent defining the standards for a prima facie case when the employment position sought by a rejected applicant was filled by someone outside her protected class. The first, and oldest line traces its origin to a decision by the former Fifth Circuit in *Crawford v. Western Electric Company, Inc.*, 614 F.2d 1300 (5th Cir. 1980).[53]   In that case, plaintiffs alleged they had been denied promotions because of their race (African-American).   The *Crawford* court formulated the following standard:

> [P]laintiffs may establish a prima facie violation by showing that they are members of a group protected by Title VII, that they sought and were qualified for positions that [the defendant] was attempting to fill, that despite their qualification they were rejected, and that after their rejection [the defendant] either continued to attempt to fill the positions or in fact filled the positions with [persons outside the protected class].

*Id.* at 1315.   The significance of the *Crawford* standard lies in the fact that it says nothing about the relative qualifications between the rejected plaintiff and the applicant to whom the promotion was

---

[53]   In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981)(en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

awarded.[54]

The second line of Eleventh Circuit precedent owes its heritage to *Perryman v. Johnson Products Co.*, 698 F.2d 1138 (11th Cir. 1983), in which the panel added a relative qualifications requirement to the *Crawford* formulation of a prima facie promotion discrimination claim:

> A plaintiff may establish a prima facie case of promotion discrimination by proving that he or she is a member of a protected minority, was qualified for and applied for the promotion, was rejected despite these qualification, and that other employees with equal or lesser qualifications who were not members of the protected minority were promoted. ...

*Id.* at 1142 n.7 (emphasis supplied) (citations omitted).[55]

---

[54] Walker v. Mortham, 158 F.3d 1177, 1186 (11th Cir. 1998), recognizes that the *Crawford* standard "is well established in this circuit," and that it had been embraced in, *e.g.*, Coutu v. Martin County Bd. of County Commrs., 47 F.3d 1068, 1073 (11th Cir. 1995), and Welborn v. Reynolds Metals Co., 810 F.2d 1026, 1028 (11th Cir. 1987).

[55] Other Eleventh Circuit precedent imposing upon a plaintiff the burden of proving at the prima facie stage that the promotion he or she sought was awarded to another employee outside the protected class who possessed equal or lesser qualifications includes the following: *e.g.*, Carter v. Three Springs Residential Treatment, 132 F.2d 635, 642 (11th Cir. 1998) ("(1) [T]he plaintiff is a member of a protected minority group; (2) the plaintiff was qualified for and applied for the promotion; (3) the plaintiff was rejected in spite of his qualifications; and (4) the individual who received the promotion is not a member of a protected group and had lesser or equal qualifications.") (emphasis supplied); Combs v. Plantation Patterns, 106 F.3d 1519, 1539 n.11 (11th Cir. 1997) ("To establish a prima facie case of discriminatory failure to promote, a plaintiff must prove: (1) that he is a member of a protected class; (2) that he was qualified for and applied for the promotion; (3) that he was rejected; and (4) that other equally or less qualified employees who were not members of the protected class were promoted.") (emphasis supplied), *cert. denied sub nom.* Combs v. Meadowcraft Co., _ U.S. _, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998); Wu v. Thomas, 847 F.2d 1480, 1483 (11th Cir. 1988) ("To establish a prima facie case of discrimination in promotion, a plaintiff must prove: (1) he or she is a member

22

The decision in *Walker v. Mortham*, 158 F.3d 1177 (11th Cir. 1998), cleared a path through the tangle of conflicting circuit precedent by hewing to that "line of authority containing the earliest case, because a decision of a prior panel cannot be overturned by a later panel." *Walker*, 158 F.3d at 1188 (citing *Johnson v. City of Fort Lauderdale*, 126 F.3d 1372, 1380 n.10 (11th Cir. 1997); *Robinson v. Tanner*, 798 F.2d 1378, 1383 (11th Cir. 1986); and *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (holding that decisions of prior panels are binding on subsequent panels, unless overturned by Congress, the Supreme Court, or the circuit sitting *en banc*)).

Further, the *Walker* court observed that the Supreme Court clearly implied in *Texas Department of Community Affairs v. Burdine*[56] and *Patterson v. McLean Credit Union*[57] that it is the defendant-employer who initially presents evidence of relative qualifications during the second, rebuttal stage of the *McDonnell*

---

of a protected minority; (2) was qualified for and applied for the promotion; (3) was rejected despite these qualification; and (4) other equally or less qualified employees who were not members of the protected minority were promoted.") (emphasis added), *cert. denied*, 490 U.S. 1006, 109 S.Ct. 1641, 104 L.Ed.2d 156 (1989).

[56] 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

[57] 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989).

23

*Douglas* analytical framework — not the plaintiff-employee during
her prima facie case. *Walker*, 158 F.3d at 1190-92.

> Since *Burdine*, we have continually recognized that
> relative qualifications belong in the rebuttal stage of
> the *McDonnell-Douglas* framework, not the prima facie
> stage. *See, e.g., Gilchrist v. Bolger*, 733 F.2d 1551,
> 1553 (11th Cir. 1984) (recognizing as a sufficient
> legitimate non-discriminatory reason for denying
> plaintiff a promotion was "the fact that '[t]he man drawn
> for the [coveted] position was selected because of his
> greater knowledge of postal requirements and because of
> [the plaintiff's] attendance problems'"); *Clark v.
> Huntsville City Bd. of Educ.*, 717 F.2d 525, 527 (11th
> Cir. 1983) ("The defendants successfully rebutted the
> [prima facie] presumption through evidence that they
> selected [the successful applicant] due to his superior
> qualifications for the position."); *Olafson v. Dade
> County Sch. Bd.*, 651 F.2d 393, 395 (5th Cir. 1981)
> (stating that the defendant employer successfully
> rebutted the plaintiff's prima facie case by "presenting
> evidence that [the successful applicant was successful]
> not because he was a man, but because, in their
> considered opinions, he was the best person for the job.
> It was then incumbent on the plaintiff ... to prove she
> was 'the victim of intentional' discrimination" (footnote
> omitted)); *see also Hill*, 8875 F.2d at 810.

*Id.* at 1191 n.29.

For such reasons, the *Walker* court held that the *Crawford*
standard "is therefore the standard to be applied in the Eleventh
Circuit." *Id.* at 1177. Thus, following the opinion in *Walker*,
Mary Anne Sims is not required to present evidence of "relative
qualifications" to establish her prima facie case, and the *Crawford*
standard applies: *i.e.*, Sims must show 1) that she is a member of
a group protected by Title VII; 2) she sought and was qualified

24

for a position that the defendant was attempting to fill;   3)
despite her qualifications, she was rejected; and 4) following
plaintiff's rejection, defendant filled the position with a person
outside her protected class.

Plaintiff satisfies all elements of a *Crawford* prima facie
case.  She is female.  It is undisputed that she applied for, and
was qualified to fill the director's position.  Even so, she was
rejected and defendant filled the position with a male applicant.
Accordingly, the burden of production shifts to the defendant to
rebut the presumption of intentional discrimination thus raised by
articulating  legitimate,  nondiscriminatory  reasons  for  the
contested employment action.  *See Burdine*, 450 U.S. at 253, 101
S.Ct. at 1093.

### 2. Defendant's legitimate, nondiscriminatory reasons

Defendant first offers proof that Mr. Hicks' qualifications
were superior to plaintiff's: *e.g.*, he had been director of Colbert
County's  emergency  management  agency  for  seventeen  years.
Defendant also presents evidence that Paulette Williams was their
first choice.  She was not offered the position, however, because
her salary requirements exceeded MCEMA's budget.[58]  Defendant thus
met the intermediate burden of production, and effectively rebutted

---

[58] See note 38 *supra.*

25

the presumption of discrimination raised by plaintiff's prima facie case.

### 3. Plaintiff's showing of pretext

To demonstrate that defendant's explanation is "a pretext for discrimination," plaintiff must be afforded the opportunity to discredit the defendant's proffered explanations for the contested employment decision, and to show that it is but a pretext for discrimination. "In other words, the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment action." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (citations omitted), *cert. denied sub nom. Combs v. Meadowcraft Co.*, ___ U.S. ___, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998); *see also Hicks*, 509 U.S. at 507-08, 113 S.Ct. at 2747-48 ("The plaintiff then has the full and fair opportunity to demonstrate, ... that the proffered reason was not the true reason for the employment decision, ... and that race [or age] was. He retains that ultimate burden of persuading the [trier of fact] that [he] has been the victim of intentional discrimination.") (citations to *Burdine* and internal quotation marks omitted).

In an attempt to rebut defendant's contention that plaintiff

26

was not chosen because Eddie Hicks was more qualified, plaintiff
argues defendant offered Paulette Williams the position knowing she
would not take it.   Plaintiff contends that Williams was never
seriously considered for the position.

Plaintiff admits Eddie Hicks was qualified for the position.
She also has no criticisms of the manner in which he is performing
his duties as director of MCEMA.  She asserts, however, that Hicks'
seventeen years of prior EMA management experience is the only area
in which his qualifications exceeded her own.  Plaintiff further
argues that defendant's emphasis on whether a candidate had
previously managed an emergency management agency is evidence of
pretext.  Plaintiff offers no objective proof to support any of her
assertions, however.  Rather, she bases her arguments solely on her
subjective belief that she was not chosen for the position because
of her gender.

The Eleventh Circuit said in *Combs v. Plantation Patterns*, 106
F.3d 1519 (11th Cir. 1997), with regard to a defendant's proffered
reasons of supervisory experience:

> [plaintiff] confuses disagreement about the wisdom
> of an employer's reason with disbelief about the
> existence of that reason and its application in the
> circumstances.  Reasonable people may disagree about [the
> wisdom of the employer's decision], but such potential
> disagreement does not, without more, create a basis to
> disbelieve an employer's explanation that it in fact
> based its decision on prior ... supervisory experience.
> [Defendant's] decision ... may seem to some to be bad

27

        business judgment, and to others to be good business
        judgment, but federal courts do not sit to second-guess
        the business judgment of employers. Stated somewhat
        differently, a plaintiff may not establish that an
        employer's proffered reasons is pretextual merely by
        questioning the wisdom of the employer's reason, at least
        not where, as here, the reason is one that might motivate
        a reasonable employer.

Combs, 106 F.3d at 1543, cert. denied sub nom. Combs v. Meadowcraft

Co., _ U.S. _, 118 S.Ct. 685, 138 L.Ed.2d 632 (1998).

        Indeed, plaintiff does not present any evidence showing

defendant did not actually determine Hicks to be more qualified.

The record before this court indicates that all three "outside"

applicants considered for the director's position possessed greater

supervisory experience than plaintiff. All "outside" applicants

held a director position with their respective agency, while

plaintiff only contends that she acted in the capacity as director

when Howard Proctor was unavailable. Plaintiff never actually held

the MCEMA director position.

        Thus, plaintiff has failed to prove defendant's reasons for

its action were merely pretext for gender discrimination.

Plaintiff has not demonstrate an existence of a genuine issue of

fact as to the truth of defendant's proffered reason for its

action. Therefore, defendant's motion for summary judgment as to

plaintiff's failure to promote claim is due to be granted.

28

C.   **Retaliation Under Title VII**

Section 704(a) of Title VII provides protection to those who
oppose or participate in uncovering an employer's discriminatory
practices.   That provision provides, in pertinent part, that:

> It shall be an unlawful employment practice for an
> employer to discriminate against any of his employees ...
> because he [the employee] has opposed any practice made
> an unlawful employment practice by this [title], or
> because he has made a charge, testified, assisted, or
> participated in any manner in an investigation,
> proceeding, or hearing under this [title]. [Emphasis
> supplied.]

Section 704(a), now codified at 42 U.S.C. § 2000e-3(a), thus
recognizes two bases for a claim of retaliation:   one for
opposition to prohibited practices, and one for participation in
protected activity.   Plaintiff's claim in this case arises under
the participation clause: *i.e.*, because plaintiff filed a charge of
discrimination with the EEOC, she has participated in a proceeding
protected under Title VII.

Both parties erroneously based their retaliation arguments on
the opposition clause.

Title VII liability attaches to an "employer":   a word
Congress defined as "a person engaged in an industry affecting
commerce ... and any agent of such a person." 42 U.S.C. § 2000e(b)
(emphasis supplied).   Generally, the phrase "any agent" is accorded
a liberal construction.   *See Garcia v. Elf Atochem North America,*

29

28 F.3d 446, 451 (5th Cir. 1994).   Under such a construction,

supervisory personnel are considered "employers" when they are

delegated traditional rights of the employer, such as the power to

hire and fire employees.   Thus, the Eleventh Circuit includes

supervisors within the definition of "employer," but only if the

supervisor is delegated final authority to make employment

decisions. *See, e.g.*, *Goldsmith v. City of Atmore*, 996 F.2d 1155,

1162 (11th Cir. 1993) (Mayor deemed "employer" when "City had

delegated final authority to Mayor ... to make employment decisions

within the City Clerk's office."); *Williams v. City of Montgomery*,

742 F.2d 586, 589 (11th Cir. 1984) ("Where the employer has

delegated control of the employer's traditional rights, such as

hiring or firing, to a third party, the third party has been found

to be an 'employer' by virtue of the agency relationship."

(citations and internal quotation marks omitted)).

In like manner, the Fifth Circuit construes the term

"employer" as including supervisors, but only when they

"participated in the decision-making process that forms the basis

of the discrimination." *Hamilton v. Rodgers*, 791 F.2d 439, 443

(5th Cir. 1986) (citations omitted); *see also, e.g., Harvey v.*

*Blake*, 913 F.2d 226, 227 (5th Cir. 1990) ("immediate supervisors

are Employers when delegated the employer's traditional rights,

such as hiring and firing").

30

The Fourth Circuit also held a supervisory employee to be an employer, but again only when he had "significant input into ... personnel decisions [such as hiring and firing]." *Paroline v. Unisys Corporation*, 879 F.2d 100, 104 (4th Cir. 1989).[59]

The instant action, however, presents a twist on the typical agency relationship. It is undisputed that Commission Chairman Bennich was acting as agent for the Morgan County Commission when he interviewed and nominated a candidate for MCEMA Director. It is not clear, however, what role Mayor Price played in the decisionmaking process. Defendant argues that Mayor Price's involvement in the interview process was strictly advisory, and that he possessed no final decisionmaking authority. The problem arises from the following facts: the City of Decatur contributed funding to aid in the operation of MCEMA; Mayor Price joined Chairman Bennich in asking questions of the applicants during the interviews[60]; and, following the interviews, Mayor Price gave Chairman Bennich his recommendations. Thus, even though Mayor Price was not the final decisionmaker, his participation in the

---

[59] *See also, e.g.*, Crawford v. West Jersey Health Systems, 847 F. Supp. 1232, 1236 (D. N.J. 1994)(defendants dismissed from action where plaintiff did not allege the "related entities were her employers, nor that they acted as agents by 'ma[king] the final decisions regarding employment matters'"(citations omitted).

[60] Price Deposition at 9.

31

decisionmaking process was sufficiently significant to compel a finding that he acted as an agent of the Morgan County Commission. Accordingly, Mayor Price's statements to Mary Anne and Eldred Sims are attributable to the Morgan County Commission, and the words attributed to the Mayor may provide a basis for imposing liability upon the commission under Title VII.

### 1.    Direct evidence of retaliation

"Statements indicating ... [retaliatory] bias on the part of a decisionmaker in an employment setting can constitute direct evidence of ... retaliation in Title VII cases." *Trotter v. Board of Trustees of the University of Alabama*, 91 F.3d 1449, 1453 (11th Cir. 1996) (emphasis supplied)(citations omitted).    Moreover, statements of decisionmakers directly related to the decisional process are direct evidence of discrimination. *See, e.g., Bell v. Birmingham Linen Service*, 715 F.2d 1552 (11th Cir. 1983).

On the other hand, statements that do "not relate directly to the decision" in dispute, or "statements that are open to more than one interpretation do not constitute direct evidence of ... discrimination." *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998); *see also Harris v. Shelby County Board of Education*, 99 F.3d 1078, 1083 n.2 (11th Cir. 1996) (statements that could "have more than one possible meaning" are

32

not direct evidence of discrimination). "Only the most blatant remarks, whose intent could only be to discriminate on the basis of [an impermissible factor] constitute direct evidence." *Coats v. Coats & Clark, Inc.*, 990 F.2d 1217, 1226 (11th Cir. 1992). Evidence merely suggesting discrimination is not sufficient. *See Earley v. Champion International Corp.*, 907 F.2d 1077, 1081-82 (11th Cir. 1990).

As previously noted, when plaintiff's husband and Mayor Price spoke on the telephone around May 30, 1996, the Mayor allegedly suggested that plaintiff's "EEOC claim" was the reason she was not being considered:[61]

A.  Right. And I [Eldred Sims] asked him [Mayor Price] again, I said, "Why are y'all passing her over?" He said, "Well, doesn't she have an EEOC suit now?" I said, "Yes. But that's not supposed to matter according to the 1964 Civil Rights Law." He said, "I know."

. . .

Q.  Is there anything else that was said by either the Mayor or you during this conversation other than that you have related to us?

A.  Nothing that I can think of right off the top of my head. But he loosely emphasized that the EEOC suit was the reason that she was being passed over.

. . .

---

[61] Eldred Sims Deposition at 25.

33

Q.   Well, Mayor Price never told you that any EEOC
     proceeding was the reason that Larry Bennich was
     not going to vote in favor of your wife being EMA
     Director?

A.   Yes, sir, he absolutely did. When he said, "Well,
     doesn't she have the EEOC suit?" That was telling
     me--

Q.   That's what you inferred?

A.   No, sir. That's what he was telling me.

Q.   Well, my question to you perhaps wasn't clear, let
     me see if I can make my question clear--

A.   No, he did not say, blah, blah, blah. No, he's
     smarter than that. But he was letting me know why
     she was being overlooked.

Q.   Let me finish my question. My question to you was:
     Mayor Price never said that any EEOC complaint that
     Mrs. Sims had filed was the reason that Larry
     Bennich wouldn't vote or wouldn't act to make her
     EMA Director; isn't that correct?

A.   He did not say those words.

(Eldred Sims Deposition at 23-25 (emphasis supplied).) Mayor Price

denies making those comments to Mr. Sims; indeed, Price contends he

did not know plaintiff had filed an EEOC charge when he spoke with

Mr. Sims. Rather, according to Mayor Price, prior to April of

1998, he knew only of the state employees' retirement system

lawsuit filed in state court.

       The statement attributed to Mayor Price is open to more than

one interpretation. Because Mayor Price allegedly used the phrase

"EEOC suit," one interpretation could be that he was referring to

34

the EEOC charge plaintiff filed on April 16, 1996. This
interpretation would support a showing of direct evidence of
retaliatory intent. On the other hand, Mayor Price contends he was
not aware of plaintiff's EEOC charge until April of 1998, and that
he only was aware of her retirement systems lawsuit on the date he
spoke to her husband. If that was the controversy to which Price
referred (and the deposition testimony extracted in the following
paragraph suggests that was the "suit" to which Mayor Price
referred), it would not constitute direct evidence of an actionable
discriminatory intent, because a state court action to compel the
county commission to enroll plaintiff in the state employees'
retirement system is not action protected by Title VII.

The following extracts from the deposition of Mary Anne Sims
serve to emphasize the ambiguity of the statements attributed to
Mayor Price by plaintiff:

Q.   This is in the October, November 1995, time period
     we're talking about?

A.   Somewhere in that area or might have even been
     later than that.  Because I did talk to him on
     several occasions.

Q.   I want you to tell me, as best you can remember, on
     each occasion, what you said to him and he said to
     you.  And I realize it's been a long time.

A.   It has been a long time, but on two occasions,
     these were phone conversations, Mayor Price said --
     I told him that I desired the director of EMA, I
     had submitted a resume, I think I deserved it.  I

35

didn't think, I knew I deserved it.  And he said
that <u>I wish that you didn't have that lawsuit in
against the county because Larry [Bennich] keeps
bringing it up</u>.

Q.   Which lawsuit was he referring to?

A.   I had another discrimination suit.

Q.   Now, that EEOC <u>charge</u> was filed in March of '96?

A.   Right.   <u>There is another lawsuit that the county
did not allow me to join that state retirement
system until 1991</u>.

Q.   Let's just make it clear, for the record, what
lawsuit your're referring to.  <u>This is a lawsuit
that was filed in the circuit court for Morgan
County</u>?

A.   Uh-huh (affirmative).

     . . .

Q.   <u>And when you were talking to Mayor Price and he
said "I wish you didn't have that lawsuit against
the county," he was referring to the retirement
lawsuit; is that correct</u>?

A.   <u>Yes</u>.

     . . .

Q.   I guess the point I'm making, though, is <u>Mayor
Price was referring to your state court lawsuit
instead of your EEOC charge</u>?

A.   <u>Prior to the EEOC charge, yes, he was talking about
the retirement suit.  But any conversation that I
had with him after that EEOC charge had been filed,
I can't tell you which one he was referring to</u>.

     . . .

A.   He just said, "I wish you hadn't filed that <u>lawsuit</u>

36

because Larry keeps bringing it up."

Q.   You were clear that he was talking about the state
     court lawsuit at one point when he said, "I wish
     you hadn't filed that <u>lawsuit</u> because Larry keeps
     bringing it up"?

A.   <u>If it was prior to EEOC, I would think that would
     be reasonable</u>.

Q.   But Mayor Price never specifically said that Mr.
     Bennich said anything about your EEOC lawsuit?

A.   He just said, "I wish you had not filed the
     lawsuit."

Q.   He never said anything about an EEOC charge of
     discrimination?

A.   He may have, I don't recall ... right now.

Q.   You're not here testifying today that Mayor
     Price said to you that in response to your
     questions about why you weren't being made
     director that you weren't being made director
     because Mr. Bennich said that you had filed an
     EEOC <u>charge</u>?   You're not here testifying to
     that?

A.   I'm saying that the mayor said that, quote, exact
     words, "I wish you had not filed that <u>lawsuit</u>
     because Larry keeps bringing it up."   The mayor
     said, "I've talked to Larry, I don't know why he's
     dragging his feet."   He agreed that a director
     needed to be appointed.   He didn't know why it was
     taking so long to get Larry together to make an
     appointment.   And he told me that on two occasions
     about the lawsuit.

Q.   The mayor did?

A.   Yes.

(Plaintiff's  Deposition  II  at  50-57)  (emphasis  supplied).)

37

Reliance upon the comments attributed to Mayor Price as direct evidence of retaliation thus is misplaced.

Plaintiff's assertions are, at best, circumstantial evidence of a retaliatory motive, but do not rise to the level necessary to be considered direct evidence. Accordingly, plaintiff has presented no direct evidence of intentional retaliation by the defendant.

### 2. Circumstantial evidence of retaliation

As a result, the familiar *McDonnell Douglas* framework will be utilized in analyzing plaintiff's circumstantial evidence of retaliation.

#### a. Plaintiff's prima facie case

To establish a prima facie case of retaliation for conduct falling under either the opposition or participation clause of 42 U.S.C. § 2000e-3(a), a plaintiff must show (1) that she engaged in statutorily protected expression or activity, (2) she suffered an adverse employment action, and (3) the adverse action was causally related to the protected expression or activity. *See, e.g.,* *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1455 (11th Cir. 1998); *Meeks v. Computer Associates International*, 15 F.3d 1013, 1021 (11th Cir. 1994); *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993).

When a retaliation claim is based upon conduct falling under

38

the opposition clause of 42 U.S.C. § 2000e-3(a), the plaintiff also

must demonstrate a good faith, reasonable basis for believing that

the underlying, allegedly discriminatory practices which she

opposed constituted a violation of Title VII, as distinguished from

proving that the employer actually engaged in an unlawful

employment practice. *See, e.g., Wu v. Thomas*, 863 F.2d 1543, 1549

(11th Cir. 1989) ("[P]laintiff need only have had a 'reasonable

belief' that an unlawful employment practice was occurring.").

This additional element of a prima facie case for a retaliation

claim under the opposition clause has two components, as the

Eleventh Circuit observed in *Little v. United Technologies*, 103

F.3d 956 (11th Cir. 1997):

> We previously have recognized that a plaintiff can
> establish a prima facie case of retaliation under the
> opposition clause of Title VII if he had a good faith,
> reasonable belief that the employer was engaged in
> unlawful employment practices. *See Rollins v. State of
> Fla. Dept. of Law Enforcement*, 868 F.2d 397, 400 (11th
> Cir. 1989). <u>It is critical to emphasize that a
> plaintiff's burden under this standard has both a
> subjective and an objective component</u>. A plaintiff must
> not only show that he <u>subjectively</u> (that is, in good
> faith) believed that his employer was engaged in unlawful
> employment practices, but also that his belief was
> <u>objectively reasonable</u> in light of the facts and records
> presented. It thus is not enough for a plaintiff to
> allege that his belief in this regard was honest and bona
> fide; the allegations and record must also indicate that
> the belief, though perhaps mistaken, was objectively
> reasonable.
>
> A plaintiff, therefore, need not prove the
> underlying discriminatory conduct that he opposed was

39

> actually unlawful in order to establish a prima facie
> case and overcome a motion for summary judgment; such a
> requirement "[w]ould not only chill the legitimate
> assertion of employee rights under Title VII but would
> tend to force employees to file formal charges rather
> than seek conciliation of informal adjustment of
> grievances." *Sias v. City Demonstration Agency,* 588 F.2d
> 692, 695 (9th Cir. 1978). *See also Payne v. McLemore's
> Wholesale & Retail Stores,* 654 F.2d 1130, 1140 (5th Cir.
> Unit A Sept. 1981) ("To effectuate the policies of Title
> VII and to avoid the chilling effect that would otherwise
> arise, we are compelled to conclude that a plaintiff can
> establish a prima facie case of retaliatory discharge
> under the opposition clause of [Title VII] if he shows
> that he had a reasonable belief that the employer was
> engaged in unlawful employment practices."), *cert.
> denied,* 455 U.S. 1000, 102 S.Ct. 1630, 71 L.Ed.2d 866
> (1982).

*Little v. United Technologies*, 103 F.3d at 960 (emphasis in

original) (footnote omitted); *see also, e.g., Meeks v. Computer

Associates International*, 15 F.3d 1013, 1021 (11th Cir. 1994); EEOC

v. White & Sons Enterprises, 881 F.2d 1006, 1012 n.5 (11th Cir.

1989); *Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491,

1494 (11th Cir. 1989); *Silver v. KCA, Inc.*, 586 F.2d 138 (9th Cir.

1978); I Barbara Lindemann & Paul Grossman, *Employment

Discrimination Law* 656-57 (3d ed. 1996) ("The rationale is that

appropriate opposition should not be chilled by fear of retaliation

— even if, as a matter of fact or law, there is no violation.")

(footnote omitted).

The Eleventh Circuit refused to decide whether protection from

retaliation under the participation clause also is conditioned by

40

a good faith, reasonable basis requirement in *Wideman v. Wal-Mart*

*Stores, Inc.*, 141 F.3d 1453, 1455 (11th Cir. 1998). In that case,

> the parties disagree[d] over whether a plaintiff who
> alleges she was retaliated against for filing an EEOC
> charge of discrimination must also establish, as part of
> her prima facie case, that she had a good faith,
> reasonable basis for filing the charge. Wideman argues
> that a plaintiff who alleges she suffered retaliation for
> filing an EEOC charge is pursuing her claim under the
> participation clause of 42 U.S.C. § 2000e-3(a), and that
> protection from retaliation under the participation
> clause is not conditioned by a good faith, reasonable
> basis requirement. Wal-Mart, on the other hand, notes
> that we have held that retaliation claims brought under
> the opposition clause of 42 U.S.C. § 2000e-3(a) are
> conditioned by a good faith, reasonable basis
> requirement, *see, e.g., Little v. United Technologies*,
> 103 F.3d 956, 959-60 (11th Cir. 1997), and argues that we
> should not distinguish retaliation claims brought under
> the participation clause from those under the opposition
> clause. The district court agreed with Wal-Mart, holding
> that Wideman did not establish a prima facie case of
> retaliation because her EEOC charge of discrimination was
> not "objectively reasonable."
>
> Because we conclude that the facts of this case,
> viewed in the light most favorable to Wideman, show that
> Wideman had a good faith, reasonable basis for filing her
> charge, [62] we need not decide whether protection from
> retaliation under the participation clause is conditioned
> by a good faith, reasonable basis requirement. ...

---

[62] Wideman testified she filed an EEOC charge because, among other reasons, she had been told by a supervisor that the "craft instructor" position Wideman had applied to fill would not be awarded "to anybody black."

Wal-Mart's counsel conceded at oral argument that Wideman would have a good faith reasonable basis for her charge if Wideman had testified that she filed the discrimination charge because Dellinger told her she would not give the position to anybody black. As we have pointed out, Wideman did testify to that.

Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1455 n.1 (11th Cir. 1998).

41

*Wideman*, 141 F.3d at 1454-55 (emphasis supplied).

This court opines that when the Eleventh Circuit does address the issue squarely, it likely will decide there is no "good-faith, reasonable basis" requirement attendant to retaliation claims under the participation clause of § 2000e-3(a). A comparison of the clauses strongly suggests that result, as one treatise has observed:

> Unlike the opposition clause, the participation clause contains no qualifying language stating that the practice opposed must be one "made an unlawful employment practice by this [title]." Thus, protection under the participation clause is not lost if the employee is wrong on the merits of the charge, even if the contents of the charge are malicious and defamatory as well as wrong.

I Barbara Lindemann & Paul Grossman, *Employment Discrimination Law* 655 (3d ed. 1996) (footnotes omitted).

Further support for resolving this issue in favor of a broad construction of the participation clause is found in analogous Eleventh Circuit precedent. In a seminal case, *Pettway v. American Cast Iron Pipe Company*, 411 F.2d 998 (5th Cir. 1969),[63] the former Fifth Circuit spoke to the issue of the breadth of protection afforded an employee by the participation clause. The court properly acknowledged that *Pettway* involved what was then "a unique

---

[63] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981)(en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

42

question arising under Title VII of the 1964 Civil Rights Act."
411 F.2d at 999. The court then framed the issue as "whether a
charge filed pursuant to § 704(a) of the Act (42 U.S.C.A. § 2000e-
3(a)) prohibits an employer from discharging an employee for having
made false statements in a request for reconsideration of his case
before the Equal Employment Opportunity Commission claiming racial
discrimination ...." Id. at 999-1000.

Although the court did not specifically address whether the
"participation"[64] of an employee is conditioned by a good faith,
reasonable basis requirement, the court did not impose such a
requirement. Rather, Pettway held that neither may an employer
determine the correctness or consequences of an employee's charge
of discrimination, nor may a court sustain an employer's
disciplinary action or deny relief because the employee included
malicious material in the charge. In other words, the
participation clause "prohibits an employer from discharging an
employee for having made false, and apparently malicious,

---

[64]Defining the protection of the participation clause, the court in Pettway
included any charge, petition for reconsideration, or other communication with
the EEOC sufficient for EEOC purposes, or in a proceeding before the EEOC. The
court noted that the requirements for a charge are liberal. See 411 F.2d at
1007.

The scope of the participation clause, however, is limited to
"participation in the machinery set up by Title VII to enforce its provisions."
Clover v. Total Systems Services, Inc., 157 F.3d 824, 829 (11th Cir. 1998)
(quoting Silver v. KCA, Inc., 586 F.2d 138, 141 (9th Cir. 1978); accord Booker
v. Brown & Williamson Tobacco, Inc., 879 F.2d 1304, 1313 (6th Cir. 1989).

43

statements in a writing purporting to be, and to be used as, a charge filed with the EEOC, if the charge or other writing is sufficient for EEOC purposes." Philip H. Myers, Annotation, *Construction and Application of § 704(a) of Civil Rights Act of 1964 (42 U.S.C.A. § 2000e-3(a)), Making It Unlawful Employment Practice to Discriminate Against Individual for Participation in Equal Employment Opportunity Proceedings or Activities*, 11 A.L.R. Fed. 316 (1972).

More recently, in *Merritt v. Dillard Paper Company*, 120 F.3d 1181 (11th Cir. 1997), the Eleventh Circuit reversed the district court's finding that <u>involuntary participation</u>[65] took the plaintiff outside the statutory language of the participation clause. Discussing the breadth of the participation clause, the court said:

> The anti-retaliation provision is straightforward and expansively written. Congress chose the language "testified" and "participated in any manner" to express its intent about the activity to be protected against retaliation. The word "testified" is not preceded or followed by any restrictive language that limits its reach. As to "participated in any manner," the adjective "any" is not ambiguous; it has a well-established meaning. Earlier this year, the Supreme Court explained, "Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" *United States v. Gonzales*, 520 U.S. 1, 117 S.Ct. 1032, 1035, 137 L.Ed.2d 132 (1997) (citation omitted).

---

[65] Plaintiff was forced to testify in a Title VII action brought against the employer by a third party employee. Plaintiff was the alleged harasser in that case, and he supported the employer and desired to defeat the Title VII claim.

44

> Here, as in *Gonzales*, "Congress did not add any language
> limiting the breadth of that word," so "any" means all.

*Merritt*, 120 F.3d at 1186.  More specifically, the court added,
"[w]e cannot add to the terms of Title VII's anti-retaliation
provision what Congress left out:  the requirement of a good
motive, a pure heart, a happy face."   *Id.* at 1187 (emphasis
supplied).

These opinions notwithstanding, when refusing to address the
issue of a good faith, reasonable basis requirement for the
participation clause, the *Wideman* court side-stepped an issue that
has created an apparent split in Eleventh Circuit precedent.[66]  The
cases diverging from that line emerging from *Pettway* stem from a
subsequent opinion of the former Fifth Circuit, *Payne v. McLemore's
Wholesale & Retail*, 654 F.2d 1130 (5th Cir. 1981).[67]  This line
deviates from the path marked by *Pettway*, because the courts either

---

[66] The analysis that follows suggests there may not be a split in Eleventh
Circuit precedent, but only confusion among the district courts.  That
determination turns on how narrowly one reads the holding in *Wu v. Thomas*, 863
F.2d 1543 (11th Cir. 1989), discussed *infra*.  Nevertheless, if such a split in
fact exists, the Eleventh Circuit is bound by the earliest panel's decision:
that is, the decision in *Pettway* which, while not inconsistent with any Supreme
Court precedent, does not apply the reasonable basis requirement to claims under
the participation clause.  *See Walker v. Mortham*, 158 F.3d 1177, 1188 (11th Cir.
1998).

[67] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981)(en
*banc*), the Eleventh Circuit adopted as binding precedent all Fifth Circuit
decisions handed down prior to the close of business on September 30, 1981.

45

have failed to distinguish claims under the opposition clause from those under the participation clause, or have relied upon cases that fail to make this distinction.[68]

*Payne* itself involved conduct falling under the opposition clause. In *Payne*, the plaintiff alleged that the defendant did not recall or rehire him because of his involvement in picketing one of the defendant's stores. In previous years, plaintiff had been laid off due to the seasonal nature of defendant's business, but always had been rehired. Plaintiff was not rehired after the layoff during which he and others picketed defendant's store, protesting alleged discriminatory employment practices of that store. Specifically, plaintiff protested the alleged refusal to hire blacks into "money-handling and supervisory positions." 654 F.2d at 1134-35. After he was not recalled by defendant, plaintiff brought suit, alleging retaliation against him for "his civil rights activity," in violation of Title VII. *Id.* at 1135. The *Payne* court properly addressed the case as one under the opposition clause, holding:

_____

[68] Lending to the confusion, courts in other circuits sometimes fail to distinguish between the two clauses of 42 U.S.C. § 2000e-3(a) when addressing claims under the opposition clause. The courts speak in broad terms, discussing the requirement that a plaintiff must have a reasonable, good faith belief that the employer's actions which the plaintiff opposed were unlawful. *See, e.g., Manoharan v. Columbia University College of Physicians and Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988).

46

> To effectuate the policies of Title VII and to avoid
> the chilling effect that would otherwise arise, we are
> compelled to conclude that a plaintiff can establish a
> prima facie case of retaliatory discharge under <u>the
> opposition clause</u> of section 704(a) if he shows he had a
> reasonable belief that the employer was engaged in
> unlawful employment practices.

654 F.2d at 1140 (emphasis supplied).  In fact, the *Payne* court

expressly distinguished that action from those under the

participation clause, and in such a manner as to suggest that a

good faith reasonable basis requirement should not apply to claims

under the participation clause:

> [T]he opposition clause "serves a more limited
> purpose" than does the participation clause. ... However,
> interpreting the opposition clause to require proof of an
> unlawful employment practice[, an argument the court
> rejected in favor of the narrower good faith, reasonable
> basis requirement,] would "chill the legitimate assertion
> of employee rights under Title VII," ... <u>just as surely</u>
> <u>as would interpreting the participation clause to require</u>
> <u>a truthful charge</u>.

*Id.* at 1139 (emphasis supplied) (citations to *Sias v. City*

*Demonstration Agency*, 588 F.2d 692, 695 (9th Cir. 1978) omitted).

Nevertheless, the failure of other courts and other panels to

distinguish between the two anti-retaliation clauses has engendered

confusion.  Courts imposing the reasonable basis requirement upon

claims under the participation clause cite, in addition to *Payne*,

four Eleventh Circuit opinions, each of which fails to distinguish

the opposition clause from the participation clause: *i.e.*, *Meeks*

*v. Computer Associates International*, 15 F.3d 1013 (11th Cir.

47

1994); *Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491 (11th Cir. 1989); *Rollins v. Florida Department of Law Enforcement*, 868 F.2d 397 (11th Cir. 1989); *Wu v. Thomas*, 863 F.2d 1543 (11th Cir. 1989), *cert. denied*, 490 U.S. 1006, 109 S.Ct. 1641, 104 L.Ed.2d 156 (1989). The first three of those four cases involved conduct covered by the <u>opposition</u> clause, <u>not</u> by the <u>participation</u> clause.[69] Indeed, only *Wu v. Thomas* involved conduct falling under

---

[69] The plaintiff in *Meeks* believed that she was paid less than her male colleagues because of her sex, and she complained to her supervisor. "Meeks alleged a pattern of harassment that constituted constructive discharge in retaliation for complaining about the disparities in the technical writer's salaries." 15 F.3d at 1015.

The conduct at issue in *Tipton* was the plaintiff's repeated challenges to decisions of her supervisor, only one of which involved conduct allegedly protected under 42 U.S.C. § 2000e-3(a). In essence, in one discussion with her supervisor, plaintiff "stated that she believed [the supervisor] was discriminating against her, and she informed [him] that she had the right to take legal action to oppose the alleged discrimination." 872 F.2d at 1494. In affirming the district court, the Eleventh Circuit repeated that court's findings: "In the final analysis, the district court found that Tipton was discharged because of her blatant challenges to [the supervisor's] authority and her refusal to accept his decisions, not because <u>she made one reference to sex discrimination</u> two days before her termination." *Id.* at 1495 (emphasis supplied).

In *Rollins* the Eleventh Circuit affirmed the judgment for defendant, entered following a trial before the district court sitting without a jury. The district court based its holding on the defendant's legitimate, nondiscriminatory reason for denying plaintiff (Rollins) promotion: that is, "that the denial of promotion was based on the manner in which Rollins complained of discrimination, not on the fact that she complained." 868 F.2d at 399. Although Rollins had previously filed charges of discrimination with the EEOC and the equivalent body under Florida law (both of which had been found baseless), this conduct was not at issue in the case. Rather, the Eleventh Circuit focused on three examples of plaintiff's conduct, from a record "replete with a variety of incidents which support the district court's determinations": (1) "Rollins habitually bypassed the chain of command [in] bringing her complaints of discriminatory employment practices"; (2) "the sheer number and frequency of Rollins' complaints"; and (3) "Rollins frequently expressed her complaints in an insubordinate and antagonistic manner." *Id.*

*Wu v. Thomas*, discussed *infra*, involved a prior legal action alleging a violation of Title VII. *See* 863 F.2d at 1549.

48

the participation clause.

Actually, there were two *Wu* decisions relevant to this discussion,[70] with one preceding the decision mentioned above. In the first action, Kathleen Wu brought suit against the University of Alabama and several of its officials alleging she had been denied promotion to full professor and the pay attendant to that status because of her gender, in violation of the Equal Pay Act, Title VII, and § 1983. The district court entered judgment in favor of defendants and the Eleventh Circuit affirmed. *Wu v. Thomas*, 847 F.2d 1480 (11th Cir. 1988) ("*Wu I*").

The second *Wu* action was brought by both Kathleen Wu and her husband, Dr. Hsiu Kwang (H.K.) Wu, a full professor and former chairman of the university's Department of Finance and Economics. Both Wus asserted that adverse employment actions taken against Dr. H.K. Wu—*i.e.*, summarily removing him from the chairmanship of his department and then "invit[ing] him] to look for work elsewhere"—were in retaliation for the EEOC charge and first suit that Ms. Wu had prosecuted against the university. *Wu v. Thomas*, 863 F.2d 1543, 1545 (11th Cir. 1989) ("*Wu II*").

The University retaliated against <u>me</u> [Kathleen Wu] by ...

---

[70] A third opinion involving these parties can be found at 996 F.2d 271, where the Eleventh Circuit addresses an appeal after the remand pursuant to *Wu II* (discussed above). This third opinion does not bear upon the issue at bar.

49

> calling my husband and suggesting that he would be
> happier teaching somewhere else. This was retaliation
> against me because (1) I have a discrimination suit
> pending against the University [Wu I]; (2) the University
> knows that if my husband took another job in a different
> city I would be likely to follow him because of our
> marital relationship.

Wu II, 863 F.2d at 1547 (emphasis supplied). Obviously, at least
as to Ms. Wu, the retaliation claim asserted in Wu II fell under
the participation clause of § 2000e-3(a). The Eleventh Circuit's
opinion in Wu II did not make such a nice distinction, however, but
merely reversed the district court's dismissal of the second
action, finding that plaintiffs had stated a valid cause of action.
Concededly, in so doing the court spoke expansively when saying
that § 2000e-3(a) "does not require" that a plaintiff alleging a
retaliation claim prove "that the employer actually have been
engaged in an unlawful employment practice; rather, the plaintiff
need only have had a 'reasonable belief' that an unlawful
employment practice was occurring." 863 F.2d at 1549. The court
cited only Payne for this proposition. Id. Nevertheless, the
court found the plaintiff had such a reasonable belief and allowed
the action to proceed. Id.

Although no panel of the Eleventh Circuit has imposed the
"good faith, reasonable basis" requirement to deny a plaintiff
relief under the participation clause, the panel in Wu II allowed

50

a claim falling under that clause to proceed because the plaintiff possessed a reasonable belief that the defendant's prior acts violated Title VII.

Not surprisingly, therefore, these circuit decisions have engendered confusion among the district courts, leading some to impose a "good faith, reasonable basis" burden on plaintiffs seeking redress under the participation clause of § 2000e-3(a). One example is *United States v. City of Montgomery*, 744 F. Supp. 1074 (M.D. Ala. 1989).

*City of Montgomery* involved conduct covered by the participation clause. The opinion arose from continuing, consolidated actions, and addressed motions by "two classes of plaintiff-intervenors on behalf of ... four [police] officers" to make the court's prior preliminary injunction permanent. *Id.* at 1077. The court had enjoined the defendants from filling the position of "deputy chief designate" with a white male officer instead of one of the four officers of African-American heritage who were similarly situated with that white officer. *Id.* Beginning its analysis, the court said that "the intervenors have shown that each of the four officers has engaged in statutorily protected activity by participating in some manner in these two Title VII cases." *Id.* at 1079. Ultimately, the court granted the motion, making the injunction permanent. *Id.* at 1088. Although

51

the district court did not hinder the plaintiff-intervenors who sought redress under the participation clause with a reasonable basis requirement, the court nevertheless called attention to such a requirement in a footnote.

> A plaintiff's discrimination suit need not be meritorious to support a subsequent claim of retaliation under § 2000e-3(a). The essence of a retaliation claim under Title VII is that the plaintiff is being punished for participating in any significant way in a suit challenging the employer's practices, regardless of the ultimate success of that endeavor. *See, e.g.,* Wu v. Thomas, 863 F.2d 1543, 1549 (11th Cir. 1989). A plaintiff need only have had a reasonable belief that the defendants had committed an unlawful employment practice under Title VII to come within the coverage of § 2000e-3(a). *Id.*

*City of Montgomery*, 744 F. Supp. at 1080 n.10. Note well that the district court cited only *Wu II* in support of imposing this burden on plaintiff. Given the favorable outcome for the plaintiff, however, any error with regard to plaintiff's burden would have been harmless. The district court was affirmed by the Eleventh Circuit without discussion in *United States v. City of Montgomery*, 911 F.2d 741 (11th Cir. 1990) (Table, No. 89-7723).

More recently, in *Amos v. Housing Authority*, 927 F. Supp. 416, 422 (N.D. Ala. 1996), a court in this district applied a good faith reasonable basis requirement despite the fact that plaintiff's conduct fell under the participation clause, and entered judgment against the plaintiff as a result. Plaintiff alleged "she was a

52

victim of retaliation in the form of a discharge in reaction to her
having filed a charge with the EEOC." 927 F. Supp at 418. It is
respectfully submitted that the *Amos* court misconstrued the cases
it relied upon. First, the court quoted *Pettway*: "In *Pettway* it
was 'not all clear that the [trial] court found the [employee's]
letter [to the EEOC] motivated by malice.'" *Id*. at 421 (quoting
*Pettway*, 411 F.2d at 1006). The *Amos* court then leaped to the
conclusion that "[i]mplied in [that] language is an emerging
limitation on retaliation claims, namely, if the employee's initial
charge of discrimination was so ridiculous as to imply malice, or,
in other words, was itself an act of retaliation, it is not
protected by the anti-retaliation provisions." *Id*. This reading
of *Pettway* disregards the former Fifth Circuit's discussion of the
breadth of the anti-retaliation provision of Title VII, *see*
*Pettway*, 411 F.2d at 1005-06, and that court's explicit holding
that it could not "deny relief [under Title VII] because of the
presence of such malicious material." 411 F.2d at 1007.

Furthermore, the *Amos* court relies upon *Payne*. The court
quotes from *Payne* and follows by declaring (incorrectly, it is
submitted) that "*Payne* stands flatly for the proposition that as a
part of Amos's prima facie case she must show that she reasonably

53

believed she was the victim of age discrimination."[71]    The *Amos*

court ignores the distinction that *Payne* involved conduct falling

under the opposition clause, whereas *Amos* involved conduct covered

by the participation clause.    Similarly, the *Amos* court cites

*Rollins* and *Meeks*, which are discussed above,[72] and which impose or

discuss a good faith, reasonable basis requirement for claims under

the opposition clause.

        The Courts of Appeal and district courts in other circuits

lend support to the reading of the anti-retaliation clauses of 42

U.S.C. § 2000e-3(a) which this court advocates:    that is, the

participation clause is intended to provide broader protection for

the more limited conduct embraced by that clause.[73]    Most, if not

_____

[71] *Amos* involved a claim based upon the Age Discrimination in Employment Act, which has an anti-retaliation clause analogous to Title VII's and is analyzed in the same manner. *See Amos*, 927 F. Supp. at 421.

[72] See note 69 *supra*.

[73] *See* Wyatt v. City of Boston, 35 F.3d 13, 15 (1st Cir. 1994) ("As for the participation clause, there is nothing in its wording requiring that the charges be valid, nor even a requirement that they be reasonable.") (internal quotation marks and citation omitted) (emphasis supplied); Booker v. Brown & Williamson Tobacco Co., 879 F.2d 1304, 1312 (6th Cir. 1989) (citing *Pettway* and noting breadth of participation clause, and that "[p]rotection is not lost if the employee is wrong on the merits of the charge, ... nor is protection lost if the contents of the charge are malicious and defamatory ....") (citations omitted); Sias v. City Demonstration Agency, 588 F.2d 692, 695 (9th Cir. 1978) ("It is well settled that the participation clause shields an employee from retaliation regardless of the merit of his EEOC charge.") (citing *Pettway*, 411 F.2d 998 (5th Cir. 1969)); Jeffries v. Kansas, 147 F.3d 1220, 1231 (10th Cir. 1998); Parker v. Baltimore and Ohio Railroad Company, 652 F.2d 1012, 1019 (D.C. Cir. 1981) ("The

54

all of the courts outside this circuit make that distinction between the clauses, at least when addressing claims under the participation clause. Therefore, these courts provide strongly persuasive authority encouraging the Eleventh Circuit to maintain and clarify this position, or to adopt this position of refusing to impose a good faith, reasonable basis requirement on plaintiffs alleging claims under the participation clause.

Accordingly, if plaintiff was not required to possess a good faith, reasonable basis for her wage discrimination claim, she satisfied the first element of a prima facie participation clause case by simply filing a charge with the EEOC on April 6, 1998.

The second element, an adverse employment action, is not disputed by the defendant.

Rather, the commission argues that plaintiff cannot establish a causal linkage between her EEOC charge and subsequent rejection for the director position. When a plaintiff fails to present any evidence of a causal linkage between his protected expression and

---

participation clause speaks in clear, absolute terms, and has accordingly been interpreted as shielding recourse to the EEOC, regardless of the ultimate resolution of the underlying claim on its merits.") (citing *Pettway*, 411 F.2d 998 (5th Cir. 1969)); Blizzard v. Newport News Redevelopment and Housing Authority, 670 F. Supp. 1337, 1344 (E.D. Va. 1984) ("Unlike the opposition clause, the participation clause ... grants an absolute privilege for filing a claim with the EEOC[, and] [t]here is no requirement in the statute that the discrimination claim be meritorious, and the courts have not imposed such a limitation.") (emphasis supplied); Wolf v. J.I. Case Company, 617 F. Supp. 858, 868 (E.D. Wis. 1985).

55

the adverse employment action allegedly inflicted in retaliation
therefor, the court must dismiss the claim. *Bailey v. USX Corp.*,
850 F.2d 1506, 1508 (11th Cir. 1988); *McCollum v. Bolger*, 794 F.2d
602, 610 (11th Cir. 1986); *Hamm v. Members of Board of Regents of
State of Florida*, 708 F.2d 647, 654 (11th Cir. 1983).

However, the causal linkage requirement is interpreted broadly
by the Eleventh Circuit: "a plaintiff merely has to prove that the
protected activity and the negative employment action are not
completely unrelated." *Meeks*, 15 F.3d at 1021 (quoting *EEOC v.
Reichhold Chemical, Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993)).
The causal linkage may be inferred from circumstantial evidence.
*See, e.g., Goldsmith*, 996 F.2d at 1163 ("At a minimum, a plaintiff
must generally establish that the employer was actually aware of
the protected expression at the time it took adverse employment
action. ... The defendant's awareness ... may be established by
circumstantial evidence.").

The linkage has been deemed established, for example, where
only a short period of time passed between the protected expression
or activity and the adverse employment action. *See Holland v.
Jefferson National Life Insurance Co.*, 883 F.2d 1307, 1314-15 (7th
Cir. 1989) (for purposes of establishing a prima facie case, the
"telling" temporal sequence of events — plaintiff's complaint

56

followed shortly by adverse employment actions — demonstrate a causal link).

Even though plaintiff does not point this court to circumstantial evidence demonstrating a causal linkage between her protected conduct and the alleged retaliatory acts, it exists nevertheless: *i.e.*, plaintiff filed her EEOC charge on April 16, 1996; and, the employment action about which she complains occurred about two months later, in June of 1996. Defendant attempts to minimize the probative force of this temporal sequence by arguing that plaintiff filed her charge of wage discrimination on April 16, 1996, after Chairman Bennich had decided to look at "outside" applicants on March 27, 1996. In other words, defendant asserts, the adverse employment decision had been made prior to plaintiff's EEOC complaint.

In *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499 (7th Cir. 1998), the Seventh Circuit refused to find a causal linkage, even though only two months separated plaintiff's filing of suit from the termination of her employment.

> A "'telling temporal' sequence" can establish that nexus [requirement of a prima facie retaliation claim], *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1315 (7th Cir. 1989), but by "telling" we mean that the employer's adverse action follows fairly soon after the employee's protected expression. *McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789, 796-97 (7th Cir. 1997). As the period of time separating the two lengthens, the hint of causation weakens. *Id.* at 797. [Plaintiff's]

57

discharge occurred five months after she filed her charge
of discrimination [and just two months after she filed
suit [74]], and we have previously concluded that when so
much time passes before the adverse action takes place,
the order in which the events occurred does not by itself
suggest a causal link between them. *See Hughes v.*
*Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992)(four
months); *Juarez v. Ameritech Mobile Communications, Inc.*,
957 F.2d 317, 321 (7th Cir. 1992)(nearly six months).

*Davidson*, 133 F.3d at 511; *see also*, e.g., *Krouse v. American*
*Sterilizer Co.*, 126 F.3d 494, 503 (3rd Cir. 1997) ("the timing of
the alleged retaliatory action must be 'unusually suggestive' of
retaliatory motive before a causal link will be inferred."); *Rio v.*
*Runyon*, 972 F. Supp. 1446 (S.D. Fla. 1997) (seven months between
opposition and termination too remote to raise causal inference).

Even so, the evidence before this court demonstrates that
plaintiff's filing of an EEOC charge and her not receiving the
director's position are not totally unrelated. Plaintiff can show
that defendant was aware of her EEOC charge when the final decision
to hire Eddie Hicks was made. Plaintiff also may rely on the
statements of Mayor Price. Given the broad interpretation of the

---

[74] See Davidson v. Midelfort Clinic, Ltd., 133 F.3d 499, 504 (7th Cir. 1998):

On May 17, Davison filed a complaint with the EEOC and the Wisconsin
Equal Rights Division claiming that Midelfort had discriminated
against her on the basis of her disability. After receiving a
right-to-sue letter from the EEOC, Davidson filed this suit on
August 1, 1995, alleging that Midelfort had violated the ADA by
refusing to accommodate her disability. On October 13, Skold and
Marten fired Davidson. ... Davidson subsequently amended her
complaint in this litigation to add the charge that she was fired in
retaliation for pursuing her rights under the ADA.

causal linkage requirement indulged by the Eleventh Circuit, this court cannot say that plaintiff has not met her burden. Accordingly, plaintiff has presented a prima facie case. Having done so, a presumption of discriminatory retaliation arises, and the burden of production shifts to defendant.

### b. Defendant's legitimate, nondiscriminatory reasons

Defendant presents evidence suggesting that Eddie Hicks was more qualified for the director's position than plaintiff, because of his 17 years of experience as Colbert County's EMA director. Defendant again asserts the decision to seek "outside" applicants (thereby effectively eliminating plaintiff from contention) was made on March 27, 1996, before plaintiff filed her first EEOC charge on April 16, 1996, and before she filed suit on August 27, 1996.

Thus, the county commission has met its burden of articulating nondiscriminatory reasons for not hiring plaintiff, and, has directed the court to specific, admissible evidence supporting those reasons. Any presumption of retaliation raised by a prima facie showing now "drops from the case." *St. Mary's Honor Center*, 509 U.S. at 509, 113 S.Ct. at 2747 (quoting *Burdine*, 450 U.S. at 255 n. 10, 101 S.Ct. at 1095 n. 10).

### c. Plaintiff's showing of pretext

At this third level of analysis, the plaintiff must be

59

afforded the opportunity to discredit the defendant's proffered explanations for the contested employment decision, and to show that it is but a pretext for discrimination.

If the plaintiff succeeds in casting doubt on the credibility of the explanations put forward by the defendant — in other words, "if there is sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of each of the employer's proffered reasons for its challenged action" — then "it follows from *Hicks* that a plaintiff is entitled to survive summary judgment, and judgment as a matter of law...." *Combs*, 106 F.3d at 1529; *see also id.* at 1532.

The evidence before this court shows the close temporal proximity between plaintiff's filing of her EEOC charge and the decision not to promote her. Moreover, the statements of Mayor Price may also be evidence of pretext. Thus, viewing the evidence in its totality, this court concludes that plaintiff has come forward with sufficient evidence from which a reasonable jury could conclude that the county commission's proffered explanations are but mere pretext for retaliation. Summary judgment for defendant therefore is inappropriate.

## IV. CONCLUSION

For the foregoing reasons, this court concludes that defendant's motion for summary judgment is due to be granted in

60

part and denied in part.  Defendant's motion to strike is due to be

denied, because the court considered plaintiff's exhibits 7 through

23 in reaching its decision.  An appropriate order consistent with

this memorandum opinion will be issued contemporaneously herewith.

DONE this __9th__ day of February, 1999.

_____

United States District Judge

SCANNED

FEB - 9 1999

61